**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FREEDOM ECONOMY BUSINESS ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; COMMUNITY DEVELOPMENT FINANCIAL INSTITUTIONS FUND; and CHRIS MILLER, in his official capacity as Director of the CDFI Fund,<br><br>Defendants. | **Case No: 1:26-cv-03288**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff, the Freedom Economy Business Association, brings this action against Defendants under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706. Freedom Economy Business Association seeks declaratory relief and injunctive relief.

## INTRODUCTION

1. In nine days from the filing of this complaint, $289 million in congressionally appropriated funds will expire—not because Congress failed to act, but because the Executive Branch refused to. Those funds were designated by Congress to support Community Development Financial Institutions ("CDFIs"), mission-driven lenders that extend credit to small businesses, entrepreneurs, and communities that the conventional banking system does not adequately serve. Congress appropriated the money. Applicants submitted their proposals. And yet Defendants branded the CDFI Fund "woke," issued reduction-in-force notices to virtually all of its employees, proposed its elimination in two successive budgets that Congress rejected, withheld apportionment

of its program funds for 359 days past the statutory deadline, and conditioned their release on a footnote giving OMB a continuing veto over Treasury's award decisions—all while opening funding rounds for the Fund's smaller programs and leaving the CDFI Program, which accounts for the vast majority of the appropriation, untouched. Defendants have refused to perform the function assigned to them by the United States Constitution: execute the law.

2. Although Treasury issued a press release on September 15, 2026, announcing that fiscal year 2025 ("FY25") CDFI Program and NACA Program awards had been made, an announcement is not an obligation. The press release disclosed no total, no awardee list and no executed Assistance Agreements—and stated only that notifications would be delivered "on or before September 30, 2026," the last day of the appropriation window. *See* Press Release, U.S. Dep't of the Treasury, *U.S. Dep't of the Treasury Announces FY 2025 and FY 2026 Awards for Multiple CDFI Fund Programs* (Sept. 15, 2026) ("Sept. 15 Press Release"). Treasury has not since disclosed that it has issued a Notice of Award or executed an Assistance Agreement for FY25 funds with any applicant.

3. The Office of Management and Budget ("OMB") sat on the FY25 program funds for 359 days past the statutory apportionment deadline, releasing them only long after the typical window in which Treasury evaluates applications, announces awards, executes Assistance Agreements, and obligates the funds expire on September 30, 2026. Unless this Court intervenes, every dollar Congress set aside for FY25 CDFI Fund awards that has not been obligated by September 30 will lapse.

4. This inaction on the part of Defendants is not only unlawful, it also has deleterious real-world consequences. CDFIs are private financial institutions—nonprofit loan funds, credit unions, community development banks, and venture capital funds—whose primary mission is to

deliver credit, capital, and financial services to communities that conventional lenders do not adequately serve. They finance small businesses, affordable housing, community facilities such as health clinics and child-care centers, and consumer needs, and they typically pair capital with technical assistance, financial counseling, and business training. As of September 30, 2024, the CDFI Fund reported 1,426 certified CDFIs with combined total assets exceeding $436 billion, operating in every State, the District of Columbia, and Puerto Rico.[1]

5. The CDFI Fund has enjoyed strong bipartisan support throughout its more than thirty-year history. Indeed, a bipartisan group of United States Senators—14 Republicans and 14 Democrats—formed the Community Development Finance Caucus in the U.S. Senate to demonstrate their bipartisan commitment to CDFI Fund's mission. *See* Press Release, Office of Sen. Mark R. Warner, *CDFI Caucus Co-Chairs Warner & Crapo Respond to Executive Order Targeting CDFI Fund* (Mar. 16, 2025). Within days of the March 2025 Executive Order discussed below, twenty-three senators, twelve of them Republicans, wrote to the Secretary that "[e]limination of key CDFI Fund functions would undermine . . . important progress,"[2] and in October 2025 more than one hundred Republican members of Congress urged the Administration "to continue carrying out the statutory obligations of the CDFI Fund."[3]

6. That support has extended to the Executive Branch under Presidents of both political parties. The Fund was created in 1994 under President Clinton; Presidents Bush, Obama,

---

[1] *See* CDFI Fund, FY 2024 Annual Report (Jan. 2025). The FY 2024 Annual Report is the most recent annual report in which the CDFI Fund has published a count of certified CDFIs by institution type and their aggregate assets.

[2] Letter from Sen. Mark R. Warner et al. to Hon. Scott Bessent, Secretary of the Treasury (Mar. 19, 2025), https://www.crapo.senate.gov/download/cdfilettertotreas03202025?download=1.

[3] Letter from Sen. Mike Crapo et al. to Hon. Scott Bessent and Hon. Russell Vought (Oct. 23, 2025), https://www.crapo.senate.gov/imo/media/doc/cdfiletter10232025.pdf.

Trump, and Biden each signed annual appropriations for it; the Obama and Biden Administrations' budgets requested increased funding for it; and in December 2020 President Trump signed legislation providing $12 billion for CDFIs and minority depository institutions, the largest investment in the industry's history, negotiated with his Treasury Department.[4]

7. While a February 2026 study by the Federal Reserve Bank of New York counted 1,378 certified CDFIs holding approximately $446 billion in assets as of mid-2025, Fed. Rsrv. Bank of N.Y., *Sizing the CDFI Industry 2011–2025*, at 1 (Feb. 2026),[5] the current Administration has sought to dismantle the CDFI Fund. In a fact sheet titled, "Cuts to Woke Programs," the White House accused the Fund of advancing a "partisan agenda," "critical race theory," "racial justice," "gender extremism," and "climate radicalism." In October 2025, the Administration issued reduction-in-force notices to virtually all of the Fund's employees. The President's budget proposal for FY26 asked Congress to eliminate the Fund's award programs outright.

8. A bipartisan Congress squarely rejected these efforts. It appropriated the same $324 million for FY26 that it had appropriated for FY25, Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 442 (2026), barred the use of any appropriated funds to "increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request" unless Congress itself enacts that change or it is made under the reprogramming

[4] Riegle Community Development and Regulatory Improvement Act of 1994, Pub. L. No. 103-325, tit. I, 108 Stat. 2160; CDFI Coalition, Appropriations History (enacted appropriations FY1995-FY2026), https://cdfi.org/policy-and-advocacy/appropriations-history/; Press Release, U.S. Dep't of the Treasury, *President's 2016 Budget Requests $233.5 Million for Treasury's CDFI Fund* (Feb. 2, 2015), https://home.treasury.gov/news/press-releases/jl9758; *White House Requests $325 Million for CDFI Fund*, ABA Banking Journal, Mar. 13, 2024, https://bankingjournal.aba.com/2024/03/white-house-requests-325m-for-cdfi-fund/; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. N, tit. V, §§ 522-523, 134 Stat. 1182 (2020).

[5] Available at https://www.newyorkfed.org/medialibrary/media/outreach-and-education/household-financial-well-being/reports/2026/sizing-the-community-development-financial-institution-industry-2011-2025.

or transfer provisions of an appropriations act, *id*. § 739, 140 Stat. at 502, and rescinded the reduction-in-force notices by statute, *see* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-37, div. A, §120 (Nov. 12, 2025).

9. Having failed to persuade Congress, Defendants are running out the clock in an effort to accomplish through unlawful withholding and delay what they could not accomplish through legislation. Their efforts unlawfully jeopardize FY25 funding for CDFIs.

10. OMB withheld apportionment of the $289 million in FY25 program funds for 359 days past the statutory deadline, releasing them only in April 2026 and subject to a restrictive footnote requiring three days' advance notice to OMB before any public announcement or obligation. Treasury has had those funds and completed applications in hand for five months, yet did not announce any awards from the FY25 appropriation until September 15, 2026—fifteen days before the appropriation expires—and even then disclosed no recipient, no amount, and no Notice of Award, stating only that awardees would be notified "on or before September 30, 2026." In a standard year, the Fund completes the cycle from application receipt to award announcement in approximately eight months; the current delay now exceeds seventeen months. The funds expire on September 30, 2026, and the Treasury has not disclosed how much of the $289 million it intends to obligate, to whom, or when; whatever portion has not been obligated on that date will lapse.

11. Absent judicial relief, any of the congressionally appropriated FY25 funds not obligated by September 30, 2026 will lapse and the communities Congress intended to serve will receive nothing. Treasury's eleventh-hour announcement does not change this calculus: an announcement is not an obligation, and Treasury has not disclosed that it has issued a Notice of Award or executed an Assistance Agreement with any applicant.

12. Plaintiff Freedom Economy Business Association ("Freedom Economy"), a membership organization whose members have applied for FY25 funds and continue to await decisions on their applications, brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706, to compel Defendants to discharge the statutory obligations they have unlawfully refused to perform. Defendants' prolonged inaction—the delayed apportionment that has left Treasury with no meaningful opportunity to act on FY25 applications before the funds expire—is causing direct, immediate, and irreparable harm to Freedom Economy's members and the communities they serve. Without this Court's intervention, Congress' authorization of funding for the CDFI program and Congress' appropriation of funds to carry out the program will be overturned by executive fiat. The small businesses, affordable housing developments, community banks, community facilities and entrepreneurs that depend on the CDFI program will be irreparably harmed without the funds Congress mandated for their use. Freedom Economy seeks declaratory and injunctive relief requiring Defendants to act on the FY25 applications before those funds expire.

## PARTIES

13. Freedom Economy is a nonprofit corporation organized under the laws of the District of Columbia and recognized as tax-exempt under Section 501(c)(6) of the Internal Revenue Code. It is a nationwide membership organization dedicated to equipping justice and sustainability investors with the legal and policy tools, education, and peer network needed to defend their rights and advance a fair, inclusive, and sustainable economy.

14. Freedom Economy has more than 20,000 members. Its members include asset managers, asset allocators, asset owners, service providers, and community development financial institutions, many of which are certified CDFIs that have applied for, and in prior years received, awards from the CDFI Fund.

15. Freedom Economy is a bona fide membership association that represents members in good faith. Its members are involved in the organization and its affairs. The members voluntarily joined Freedom Economy and pay dues. Freedom Economy brings this action on behalf of its members.

16. Defendant United States Department of the Treasury ("Treasury") is an executive department of the United States, headquartered in Washington, D.C.

17. Defendant Scott Bessent is the Secretary of the Treasury. He is sued in his official capacity.

18. Defendant Community Development Financial Institutions Fund (the "CDFI Fund") is a component of the Department of the Treasury. The CDFI Fund was created to "expand economic opportunity for underserved people and communities by supporting the growth and capacity of a national network of community development lenders, investors, and financial service providers."[6]

19. Defendant Chris Miller is the Director of the CDFI Fund. He is sued in his official capacity.

## <u>JURISDICTION AND VENUE</u>

20. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 702, 706.

21. This Court may grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. § 706.

---

[6] CDFI Fund, *Mission*, https://www.cdfifund.gov/about.

22. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and officers of the United States sued in their official capacities. Defendants reside in this District, and Plaintiff is organized under the laws of the District of Columbia.

## LEGAL AND REGULATORY BACKGROUND

### I. The CDFI Fund's Statutory Scheme

23. Congress created the Community Development Financial Institutions Fund (the "CDFI Fund" or the "Fund") in Title I of the Riegle Community Development and Regulatory Improvement Act of 1994, Pub. L. No. 103-325, 108 Stat. 2160 (codified at 12 U.S.C. §§ 4701-4719) (the "Riegle Act" or the "Act"), to "promote economic revitalization and community development through investment in and assistance to community development financial institutions." 12 U.S.C. § 4701(b).

24. The Act defines a CDFI as a non-governmental entity whose primary mission is promoting community development, that serves an underserved investment area or targeted population, and that provides development services in conjunction with its financing. 12 U.S.C. § 4702(5). Although the Act established the Fund as a wholly owned Government corporation, Congress placed it within the Department of the Treasury in 1995, where it has since operated as a component reporting through the Under Secretary for Domestic Finance. 12 U.S.C. § 4703(a)(2); *id*. § 4703 note.

25. The need for CDFIs is acute. According to the Federal Deposit Insurance Corporation's most recent national survey, 4.2 percent of U.S. households had no bank or credit union account in 2023, and an additional 14.2 percent were "underbanked," meaning they had an account but also relied on nonbank products such as payday loans, check cashing, or pawn loans to meet basic financial needs. FDIC, *2023 FDIC National Survey of Unbanked and Underbanked*

*Households*, at 1, 15 (Nov. 2024).[7] Small businesses, homebuyers, and community facilities in low-income and rural communities frequently cannot obtain credit from conventional lenders on affordable terms and thus rely on CDFIs for lending support.

26. The Act establishes a competitive framework for providing assistance to CDFIs. It prescribes the contents of applications, 12 U.S.C. § 4704, and directs the Fund to select recipients based on enumerated factors—including the likelihood of success of the applicant's strategic plan, the extent of need in its market, and its record of serving that market—while seeking geographic diversity. 12 U.S.C. § 4706(a)-(b). The Fund may provide financial assistance in the form of equity investments, deposits, credit union shares, loans, and grants, 12 U.S.C. § 4707(a), as well as technical assistance, subject to a cap of $5 million per recipient and its affiliates during any three-year period. 12 U.S.C. § 4707(d). Financial assistance must be matched dollar-for-dollar with non-federal funds, and the Fund may not provide financial assistance until matching funds are secured. 12 U.S.C. § 4707(e). The Fund must enter into an Assistance Agreement with each recipient specifying the terms, conditions, and performance goals of the award. 12 U.S.C. § 4707(f). The Act's authorization of appropriations expired after fiscal year 1998; since then, Congress has funded the Fund through annual appropriations acts that mandate specified sums "to carry out" the Act. *See e.g*., Pub. L. No. 118-47, div. B, tit. I, 138 Stat. at 524; 12 U.S.C. § 4718. The FY25 and FY26 appropriations acts further detail that individual CDFI programs receive "not less than" the specified sums. *See* Pub. L. No. 119-4, 139 Stat. 9 (continuing Pub. L. No. 118-47, div. B, tit, I, 138 Stat. at 524-25); Pub. L. No. 119-75, 140 Stat. 173, 442. The FY26 appropriations act reinforces this mandate by prohibiting the use of any appropriated funds to "increase, eliminate,

[7] Available at http://www.fdic.gov/household-survey.

or reduce funding for a program, project, or activity as proposed in the President's budget request" unless Congress itself enacts that change. Pub. L. No. 119-75, § 739, 140 Stat. at 502.

## II. The CDFI Certification Process

27. Certification by the CDFI Fund is the gateway to the Fund's programs. Under the Fund's regulations, an entity is eligible for certification if it (i) is a legal entity; (ii) has a primary mission of promoting community development; (iii) is a financing entity whose predominant business activity is the provision of financial products and services; (iv) serves one or more Target Markets,[8] consisting of an Investment Area meeting specified distress criteria and/or a Targeted Population of low-income persons or persons lacking adequate access to financial products and services; (v) provides development services in conjunction with its financing; (vi) maintains accountability to its Target Market through representation on its governing or advisory boards; and (vii) is not a government entity. 12 C.F.R. § 1805.201(b).

28. Certification also functions as a signal of legitimacy to private and philanthropic funders, and banks receive consideration under the Community Reinvestment Act for qualifying investments in CDFIs. Because most Fund financial assistance must be matched with non-federal capital, the certification and award framework is designed to leverage federal dollars with private investment.

29. Certification is a regulatory status conferred by Treasury, not a charter, and every certified CDFI must file an Annual Certification and Data Collection report, including transaction-level lending data, to maintain its status. *See* 12 C.F.R. § 1805.201(c).

[8] Capitalized terms not otherwise defined in this Complaint have the meanings given them in the Riegle Community Development and Regulatory Improvement Act of 1994, 12 U.S.C. § 4702, and the CDFI Fund's implementing regulation, 12 C.F.R. § 1805.104, as cited where each term first appears.

30. On December 7, 2023, the Fund issued a substantially revised certification application and required every previously certified CDFI to reapply for certification during a window between August 1 and December 20, 2024. Institutions that did not reapply within their assigned window lost their certification. The Fund's review of reapplications has continued on a rolling basis into 2026.[9] Scores of CDFIs invested significant time and resources in completing this recertification process—only to find that the Administration would subsequently seek to dismantle the very program they had requalified to participate in.

## III. The CDFI Fund's Programs and Award Process

31. The Fund's principal program is the CDFI Program, authorized by 12 U.S.C. § 4707 and administered under 12 C.F.R. part 1805. Through the CDFI Program, the Fund makes two types of awards: Financial Assistance ("FA") awards, which provide capital that a CDFI deploys in its Target Market, and Technical Assistance ("TA") awards, which fund capacity-building. FA awards are organized into base and supplemental categories; in fiscal year 2025, the supplemental categories included persistent poverty counties, healthy food financing, disability funds, and housing production. *See* Notice of Funds Availability, Community Development Financial Institutions Program FY 2025 Funding Round, 90 Fed. Reg. 6,051, 6,052-53 (Jan. 17, 2025).

32. FA awards may take the form of grants, loans, equity investments, deposits, or credit union shares, with the form tracking the recipient's matching funds; TA awards are grants.

---

[9] *See* CDFI Fund, *CDFI Certification—Apply*, http://www.cdfifund.gov/programs-training/certification/cdfi/apply-step (last visited Sept. 11, 2026) (stating that "[a]ll organizations that were Certified as CDFIs as of December 7, 2023 were required to reapply for CDFI Certification using the revised CDFI Certification Application following a set schedule"; and that "[d]ue to a considerable backlog of Applications under review, the CDFI Fund is unable to provide an estimate for how long it will take to finalize CDFI Certification Application decisions").

33. In fiscal year 2024, the most recent year in which the Fund made FA awards, the Fund awarded $408.2 million to 357 CDFIs in 43 States, the District of Columbia, and Puerto Rico, with 91 first-time recipients.[10]

34. The Fund also administers several other programs funded from the same annual appropriation, including the Native American CDFI Assistance ("NACA") Program, the Bank Enterprise Award ("BEA") Program, and the Small Dollar Loan Program. 12 U.S.C. § 4713a; 12 C.F.R. pt. 1808.

35. Each CDFI Program funding round begins with a Notice of Funds Availability ("NOFA") published in the Federal Register, which establishes the dollar amounts available in each award category, the eligibility requirements, submission deadlines, and review procedures for that round. 12 C.F.R. § 1805.600. To be eligible for an FA award, an applicant must be a certified CDFI as of the date the NOFA is published and must meet supervisory and compliance conditions specified in the NOFA. 12 C.F.R. § 1805.200. The Fund evaluates applications against enumerated regulatory criteria—including the applicant's community development track record, financial and operational capacity, the needs of its Target Market, and its performance under any prior award—as well as any additional criteria set forth in the NOFA. 12 C.F.R. §§ 1805.700–701; *see also 2025 CDFI Program and NACA Program Application Overview*, at 96-107 (Jan. 2025) ("CDFI Fund Application Overview").[11]

36. Upon selecting a recipient, the Fund notifies the recipient of the award, and before providing any assistance, the Fund executes an Assistance Agreement specifying the terms,

---

[10] CDFI Fund, *CDFI Fund Announces FY 2024 CDFI Program and NACA Program Financial Assistance Awards* (Sept. 26, 2024), https://www.cdfifund.gov/news/605.

[11] Available at https://www.cdfifund.gov/system/files/2025-01/FY_2025_CDFI_NACA_Application_Overview.pdf.

conditions, and performance goals of the award and incorporating the government-wide Uniform Administrative Requirements. 12 U.S.C. § 4707(f)(2)(A); 12 C.F.R. § 1805.801; 2 C.F.R. part 200. The Fund does not disburse award funds until the Assistance Agreement is executed and its conditions, including the matching-funds requirement, are satisfied. *See* 12 C.F.R. § 1805.802. When appropriated funds become obligated is governed by 31 U.S.C. § 1501(a)(5), which requires that an obligation for a grant be supported by documentary evidence of a grant payable, "under an agreement authorized by law." *Id.* § 1501(a)(5)(B). Neither the Riegle Act nor the Fund's regulations address when an award obligates appropriated funds. The Fund's own audited financial statements reflect how it applies § 1501 to its awards: appropriated funds supporting competitive grant awards "become obligated when the CDFI fund issues a Notice of Award," while funds supporting loan and equity awards become obligated only "when the relevant parties enter into a fully executed agreement that includes the amount, terms of repayment, and other key aspects of the arrangement." CDFI Fund, FY 2025 Agency Financial Report, Notes to the Financial Statements, Note 1.Q ("Appropriations and other Budgetary Activity"), at 26-27 (Feb. 2026).

37. Defendants' conduct complained of here—to wit, the delays in apportioning and obligating funds—is without precedent. Regarding the FY25 funds, more than seventeen months have elapsed since the application deadline, and no award to any applicant has been disclosed. By contrast, the Fund's ordinary practice runs on a cycle of approximately eight to eleven months: a NOFA is published in December or January, applications are due in March, and awards are announced in September. Treasury's own performance measure for the CDFI Program sets a target of 6.5 months from application deadline to award announcement; actual cycle times were 8.0 months in fiscal year 2023, 8.6 months in fiscal year 2024, and 10.9 months in fiscal year 2025. U.S. Dep't of the Treasury, Community Development Financial Institutions Fund, *FY 2027*

*Congressional Justification and Budget in Brief*, at 11 (Apr. 2026) ("Treasury FY 2027 Budget in Brief").[12]

## IV. Mandatory Apportionment Under Title 31

38. Applicable law sets out how appropriations get from the halls of Congress to their congressionally-authorized purposes. Congress enacts appropriations to set the amounts that agencies are permitted to spend. OMB, where required to do so, apportions those funds to set the pace of the agencies' spending. Agencies then obligate the appropriated, apportioned funds to objectives consistent with the congressionally-authorized purpose.

39. Most appropriations enacted by Congress do not become available for an agency to obligate automatically. Under 31 U.S.C. § 1512, an appropriation available for obligation for a definite period "shall be apportioned" so as to prevent obligation at a rate that would require a deficiency or supplemental appropriation. 31 U.S.C. § 1512(a), (c)(1). An appropriation may be apportioned by time period, by activity, or by a combination of the two. 31 U.S.C. § 1512(a). The apportionment function is vested in the President and has been delegated to the Director of OMB. OMB Circular No. A-11, Preparation, Submission, and Execution of the Budget (2025).[13]

40. Section 1513(b) of Title 31 fixes the timetable. The head of the agency must submit the information required for apportionment, "not later than the later of" 40 days before the beginning of the fiscal year or 15 days after the date of enactment of the appropriation. 31 U.S.C. § 1513(b)(1). Then, the President "shall notify the head of the executive agency of the action taken in apportioning the appropriation . . . not later than the later of" 20 days before the beginning of

[12] Available at https://home.treasury.gov/about/budget-financial-reporting-planning-and-performance/budget-requestannual-performance-plan-and-reports/budget-in-brief.

[13] Available at https://www.whitehouse.gov/wp-content/uploads/2025/08/a11.pdf.

the fiscal year or "30 days after the date of enactment of the law by which the appropriation is made available." 31 U.S.C. § 1513(b)(2).

41. Each fiscal year, each agency head "shall apportion among the major organizational units of the department the maximum amount to be expended by each unit during the fiscal year out of each contingent fund appropriated for the entire year for the department." 31 U.S.C. § 1513(c). The apportioned amount may only be changed by the head of each department's written notice, which must "state the reasons for the change." *Id.*

42. Until these funds are apportioned, they are legally unavailable to the agency. The Antideficiency Act prohibits any officer or employee of the United States from making or authorizing an obligation or expenditure exceeding an apportionment, and requires that violations be reported to the President and Congress. 31 U.S.C. §§ 1341(a), 1517(a)-(b). An agency therefore cannot obligate appropriated funds that OMB has not apportioned. OMB's failure to apportion funds within the statutory period amounts to an impermissible executive veto over congressional spending decisions by leaving funds appropriated by Congress all but entirely beyond the agency's reach. *See Clinton v. City of New York*, 524 U.S. 417, 438-41 (1998) (striking down Line Item Veto Act and holding that the President may not unilaterally cancel items of spending enacted by Congress).

## <u>FACTUAL ALLEGATIONS</u>

### I. Congress Funded the CDFI Fund Through Intervening Continuing Resolutions and Ultimately Appropriated $324 Million for FY25.

43. No regular appropriations act for FY25 was enacted prior to the start of the fiscal year on October 1, 2024. Congress instead funded the government, and the CDFI Fund's programs, through a series of continuing resolutions. On September 26, 2024, the President signed the Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, 138 Stat. 1524, which

provided continuing FY 2025 appropriations for the CDFI Fund Program Account at FY 2024 rates through the earlier of December 20, 2024, or the enactment of the applicable appropriations act. Section 108 of Division A of Pub. L. No. 118-83 waived the normal apportionment submission timetable for accounts funded under that CR. On December 21, 2024, the President signed the American Relief Act, 2025, Pub. L. No. 118-158, Division A of which, the Further Continuing Appropriations Act, 2025, extended continuing appropriations for the CDFI Fund Program Account at FY 2024 rates through the earlier of March 14, 2025, or the enactment of the applicable appropriations act. No equivalent waiver applied under Pub. L. No. 118-158; accordingly, under 31 U.S.C. § 1513(b)(2), OMB was required to apportion the CDFI Fund's program funds no later than January 20, 2025, thirty days after enactment. OMB did not issue an apportionment schedule for the account until July 30, 2025. It was under the authority of these continuing resolutions that the Fund published the FY 2025 NOFA on January 17, 2025, including the caveat that awards would be made "subject to final appropriations."

44. On March 15, 2025, following the two continuing resolutions described above, Congress enacted the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9, which provided the full-year FY 2025 appropriation of $324 million to the CDFI Fund Program Account, to remain available until September 30, 2026. Of that amount, Congress directed that not less than $188 million be made available for CDFI Program financial and technical assistance, not less than $40 million for the Bank Enterprise Award Program, not less than $28 million for the NACA Program, not less than $24 million for the Healthy Food Financing Initiative, and not less than $9 million for the Small Dollar Loan Program, with up to $35 million for administrative expenses. Congress further directed that not less than 10 percent of

the funds awarded under the heading be used for awards serving populations living in persistent poverty counties. *Id.*; *see also* Treasury FY 2027 Budget in Brief, at 1.

45. For fiscal year 2026, following a lapse in appropriations from October 1 through November 12, 2025, and a further brief lapse at the end of January 2026, Congress enacted the Consolidated Appropriations Act, 2026 on February 3, 2026, again appropriating $324 million, to remain available until September 30, 2027, with the same program allocations. Pub. L. No. 119-75, 140 Stat. 173, 442. The fiscal year 2026 act also provides, in a general provision applicable to the Financial Services and General Government title, that, "[n]one of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act." *Id.* § 739, 140 Stat. at 502.

46. The President's fiscal year 2026 budget proposed to eliminate the Fund's discretionary award programs; the President's fiscal year 2027 budget, transmitted in April 2026, proposed $119,500,000 for the Fund—consisting of $100 million for a new rural-focused program and $19,500,000 for administration—and proposed to eliminate the CDFI Program's existing award categories, the Bank Enterprise Award Program, the Small Dollar Loan Program, and the Bond Guarantee Program. *See* Treasury FY 2027 Budget in Brief. Congress rejected the President's proposals. It has enacted a continuing resolution funding the Fund at the fiscal year 2026 level through December 11, 2026. Continuing Appropriations and Extensions Act, 2027, Pub. L. No. 119-103 (Sept. 2, 2026).

## II. The Administration's Campaign to Dismantle the CDFI Fund.

### A. The Administration Brands the CDFI Fund "Woke" and Seeks Its Elimination.

47. On March 14, 2025, the President issued Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," which directed that the "non-statutory components and functions" of several governmental entities, including the CDFI Fund, "be eliminated to the maximum extent consistent with applicable law," and directed the head of each entity to report to the Director of OMB within seven days confirming compliance and identifying which of its functions are statutorily required. Exec. Order No. 14238, *Continuing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 13,043, 13,043-44 (Mar. 14, 2025).

48. Treasury's own report to OMB, submitted just seven days later, concluded that each of the Fund's eleven programs and functions is statutorily required and that the Fund was performing its statutory functions as required by law. U.S. Dep't of the Treasury, Report to the Office of Management and Budget Pursuant to Executive Order 14238 (Mar. 21, 2025).[14] The Administration thus knew—from its own legal analysis—that the programs it sought to eliminate are mandated by statute. That conclusion has not deterred it from pursuing the same result by other means.

49. On or about May 2, 2025, OMB transmitted the President's fiscal year 2026 discretionary budget request, which proposed to eliminate the Fund's discretionary award programs. The budget request stated, "[p]ast awards may have made race a determinant of access to loan programs to 'advance racial equity,' funded products and services that built so-called

---

[14] Although Treasury has not publicly released this report, Novogradac & Company posted a copy of it on March 28, 2025, available at https://www.novoco.com/public-media/documents/cdfi-report-from-treasury-03212025.pdf (last visited Sept. 16, 2026). Treasury has never disputed the document.

'climate resiliency,' and framed American society as inherently oppressive rather than fostering unity. The CDFI industry has matured beyond the need for 'seed' money and should at this point be financially self-sustaining." OMB, F*iscal Year 2026 Discretionary Budget Request*, at 35 (May 2, 2025).

50. During the lapse in appropriations that began October 1, 2025, the Administration issued reduction-in-force notices dated October 10, 2025, to virtually all of the Fund's approximately 80 employees. *See* Claire Williams, *Trump Admin Lays Off Treasury CDFI Staff*, Am. Banker, Oct. 10, 2025.

51. In April 2026, OMB transmitted the President's fiscal year 2027 budget, which again proposed to eliminate the Fund's existing discretionary award programs. Treasury FY 2027 Budget in Brief. In testimony before Congress in April 2026, Defendant Vought stated that many CDFIs "continue to be woke," and Defendant Bessent stated that the CDFI Program, "had lost its way." Claire Williams, *OMB's Vought: CDFIs Funded "Woke" Programs*, Am. Banker, Apr. 15, 2026; Ebrima Santos Sanneh, *Bessent Says CDFI Fund "Had Lost Its Way*," Am. Banker, Apr. 22, 2026.

**B. The FY25 Funding Round: Applications Completed, Awards Nowhere in Sight.**

52. On January 17, 2025, while the Further Continuing Appropriations Act, 2025, Pub. L. No. 118-158, was in effect, the Fund published in the Federal Register the NOFA for the FY25 CDFI Program funding round. 90 Fed. Reg. 6,051. The phrase "subject to final appropriations" in the NOFA reflected the fact that the full-year FY25 appropriation had not yet been enacted; the NOFA was published under the authority of the continuing resolution then in effect. The NOFA stated that, subject to final appropriations, the Fund expected to award approximately $320 million, allocated as follows: $14.8 million in Base-FA Category I awards for small and emerging CDFIs;

$101.2 million in Base-FA Category II awards for Core CDFIs; $21 million in Persistent Poverty Counties-FA; $20 million in Disability Funds-FA; $24 million in Healthy Food Financing Initiative-FA; $100 million in Housing Production-FA; and $39 million in TA. *Id*. at 6,052-53. The NOFA set a deadline of February 18, 2025, for the SF-424 submission through Grants.gov and March 21, 2025, for the full application through AMIS, *id*. at 6,051-52, and stated that the period of performance for FA awards would begin the date of the award announcement, *id*. at 6,053. The Fund's published materials indicated that awards were anticipated in the fall of 2025. *Id*. at 6,071; CDFI Fund Application Overview.

53. Applicants, including members of Freedom Economy that are certified CDFIs, submitted applications by the March 21, 2025, deadline, and the Fund commenced its review. By September 25, 2025, the Fund had completed the first three steps of its five-step review[15] and advanced applications to the fourth, policy-objective step: the Fund's amendment to the NOFA published that day provided that applicants whose applications had "advanced to step 4 in the scoring/evaluation process" would be notified and given an opportunity to update their applications. *See* Amendment of Notice of Funds Availability for Community Development Financial Institutions Program; Revised Application Submission Deadline, 90 Fed. Reg. 46,303, 46,303 (Sept. 25, 2025).

54. On September 25, 2025, with applications pending for more than six months and the Fund's review under way, the Fund published an amendment to the NOFA that stripped from the FY25 funding round several categories of eligible activities and populations. 90 Fed. Reg.

[15] For FA applications, the Fund's published guidance describes a five-step review process: eligibility review; financial analysis and compliance-risk evaluation; business-plan review by external reviewers; policy-objective review; and award-amount determination. *See* CDFI Fund Application Overview at 96-107.

46,303. The amendment removed "Climate-Focused Financing" from the list of eligible activities; deleted African American, Hispanic, Other Pacific Islander, Filipino, and Vietnamese individuals from the definition of "Eligible Market," leaving only low-income individuals, Native American, Native Hawaiian, and Alaska Native individuals, and persons with disabilities; and revised the definition of "Healthy Foods." *Id.* at 46,303-04. The amendment stated that the changes "promote consistency with recent court decisions regarding race-based preferences and reflect the current Administration's priorities, as reflected in the President's executive orders," but cited no statutory or regulatory authority. *Id.* at 46,303. Applicants whose applications had advanced to the fourth step of review were given until October 27, 2025, to update their submissions. *Id.*

55. During the ensuing lapse in appropriations that began October 1, 2025, the Administration issued reduction-in-force notices to virtually all of the Fund's employees. No further action was taken on FY25 applications during this period. Following enactment of the FY26 appropriation on February 3, 2026, the Fund published a further amendment to the NOFA on March 10, 2026, extending the deadline for supplemental submissions to April 10, 2026. 91 Fed. Reg. 11,595, 11,595 (Mar. 10, 2026).

56. On September 15, 2026—fifteen days before expiration of the appropriation—Treasury issued a press release announcing that FY25 CDFI Program and NACA Program awards had been made. Sept. 15 Press Release. Unlike every prior year's award announcement, the press release disclosed no total dollar amount, no number of awardees, and no award list. *Id*. The press release stated that Treasury would evaluate awards for compliance with Executive Order 14332 (Improving Oversight of Federal Grantmaking), Executive Order 14173 (Ending Illegal Discrimination and Restoring Merit-Based Opportunity), Executive Order 14281 (Restoring Equality of Opportunity and Meritocracy), Executive Order 14218 (Ending Taxpayer

Subsidization of Open Borders), and “other applicable Executive Orders and Federal requirements,” and that “[e]xamples of each program’s Assistance Agreement terms will be posted to the CDFI Fund’s website in the coming weeks.” *Id*. The press release stated only that notifications would be delivered “on or before September 30, 2026”—the last day of the appropriation window. *Id*. As of the date of this Complaint, more than seventeen months after the application deadline, Treasury has not disclosed that it has issued a Notice of Award or executed an Assistance Agreement for FY25 funds with any applicant. An announcement is not an obligation. Throughout the seventeen months preceding the September 15 announcement, the Fund offered no explanation for the delay in making awards, published no notice in the Federal Register concerning when awards would be made, issued no communication to applicants about the status or timing of award decision, and provided no projected timeline for action—leaving hundreds of applicants and the communities they serve without any indication of whether or when the Fund intended to discharge its statutory obligations.

57. Yet Treasury has demonstrated that it is fully capable of acting when it chooses to. The FY25 appropriation remained available for new obligations through September 30, 2026. Treasury chose to use that window to open BEA, Small Dollar Loan, and Bond Guarantee rounds, programs representing a small fraction of the overall appropriation, while leaving the CDFI Program, which accounts for the vast majority of the $289 million in program funds, entirely untouched. On June 30, 2026, the Fund opened application rounds for the Bank Enterprise Award Program (up to $40 million), the Small Dollar Loan Program (up to $9 million), each stating that awards would be funded from the fiscal year 2025 appropriation. CDFI Fund, FY 2026 Bank Enterprise Award Program Round Opens (June 30, 2026); FY 2026 Small Dollar Loan Program Round Opens (June 30, 2026). Treasury’s ability to initiate these funding rounds—while leaving

the CDFI Program, which accounts for the vast majority of the appropriation, untouched—confirms that the failure to act is a matter of choice, not capability.

58. The FY25 appropriation expires for purposes of new obligations on September 30, 2026.

**C. OMB Withholds FY25 Program Funds for More Than a Year.**

59. Following enactment of the full-year FY 2025 appropriation on March 15, 2025, the 30-day period for apportionment under 31 U.S.C. § 1513(b)(2) expired on or about April 14, 2025. As described above, OMB had not issued an apportionment schedule for the CDFI's program funds under the preceding continuing resolutions. OMB again failed to apportion the $289 million in program funds by the April 14, 2025 deadline. From the enactment of the full-year appropriation on March 15, 2025, to OMB's eventual apportionment on April 8, 2026, the program funds sat unapportioned for 389 days, 359 days past the statutory deadline.

60. OMB apportioned the $35 million appropriated for the Fund's administrative expenses, but did not apportion the remaining $289 million appropriated for the Fund's award programs. OMB, SF-132 Apportionment Schedule, Treasury Account 020-1881 (Community Development Financial Institutions Fund Program Account), FY 2025 annual funds, Iteration 1 (approved July 30, 2025) (apportioning $35,000,000 for administration and carrying $289,000,000 as an anticipated nonexpenditure transfer). Treasury's Office of Inspector General reported that, as of September 30, 2025, the Fund held unobligated balances of $779.6 million, of which $405.8 million had not been apportioned. Treasury Office of Inspector General, OIG-26-009, *Audit of the CDFI Fund's Financial Statements for Fiscal Year 2025*, at 17 (Jan. 14, 2026).

61. On July 29, 2025, a bipartisan group of twenty-six United States Senators wrote to the Director of OMB urging the release of the Fund's fiscal year 2025 appropriations. Letter from Sen. Mike Crapo, Sen. Mark R. Warner & Bipartisan Group of 24 Other Senators to Hon. Russell

Vought, at 1 (July 29, 2025). On October 23, 2025, 105 Members of Congress made a similar request. Letter from Rep. Young Kim, Sen. Mike Crapo & 105 Members of Congress to Hon. Scott Bessent and Hon. Russell Vought (October 23, 2025). OMB did not act on either request.

62. On April 8, 2026—359 days after the statutory deadline—OMB finally apportioned the $289 million in fiscal year 2025 program funds. But the apportionment came with strings attached. OMB designated a footnote, "A1," requiring Treasury to provide notification to OMB three days in advance of any public announcement or obligation of award amounts. OMB, SF-132 Apportionment Schedule, Treasury Account 020-1881 (Community Development Financial Institutions Fund Program Account), FY 2025/2026 funds, Iteration 1 (approved Apr. 8, 2026) (footnote A1: "Funds are apportioned with the understanding that Treasury provide notification to OMB three days in advance of public announcement or obligation of award amounts. [Rationale: OMB requests additional information on programmatic spending for some or all of the apportioned funds.]"). The footnote's anodyne rationale—that "OMB requests additional information on programmatic spending"—cannot obscure its effect: OMB has arrogated to itself a continuing veto over the Fund's award decisions, conditioning Treasury's ability to obligate congressionally appropriated funds on OMB's prior review and acquiescence.

63. On April 9, 2026, Treasury issued a press release announcing that the FY25 funds had been released and describing measures it intended to take with respect to the Fund's programs. Press Release, U.S. Dep't of the Treasury, *Treasury Moves to Prevent Abuse of Community Development Financial Institutions (CDFI) Fund Programs* (Apr. 9, 2026) ("Treasury Apr. 9 Press Release").

64. As of the date of this Complaint, approximately five months after the April 8, 2026, apportionment and nine days before the fiscal year 2025 appropriation expires, Treasury has not

disclosed that it has issued a Notice of Award or executed an Assistance Agreement with any applicant. Treasury's eleventh-hour press release is not a substitute for the binding commitments the law requires—and the clock is running out.

**D. Treasury Imposes New Conditions Congress Never Authorized.**

65. These measures are of a piece with the September 25, 2025, NOFA amendment described above, which removed climate-focused financing and race-based eligibility categories from the FY25 funding round. On April 9, 2026, Treasury announced that it would (a) publish a notice of proposed rulemaking classifying certain CDFI Fund benefits as "federal public benefits" under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996; (b) require every certified CDFI, as a condition of certification and of any award, to adopt, maintain, and annually certify policies prohibiting employment or financial preferences based on race, ethnicity, or sex inconsistent with federal law; and (c) pursue remedies for noncompliance including decertification, termination of unused award funds, and recapture of past awards. Treasury Apr. 9 Press Release.

66. On April 27, 2026, Treasury announced a compliance review of all certified CDFIs, stating, "CDFIs that engage in predatory practices and take advantage of the very communities they are intended to serve will be reviewed and, where appropriate, held accountable." Press Release, U.S. Dep't of the Treasury, *Treasury Moves to Prevent Abuse of Community Development Financial Institutions Fund Programs* (Apr. 27, 2026).

67. Under the Fund's regulations, a recipient's noncompliance with the Act, the regulations, or its Assistance Agreement may result in sanctions including revocation of the award, reduction or termination of funding, repayment of assistance, and a bar on reapplying for assistance; with respect to insured depository CDFIs, the Assistance Agreement is enforceable under 12 U.S.C. § 1818. *See also* 12 C.F.R. § 1805.801(c)-(e).

**III. The Communities Congress Intended to Serve Are Being Left Behind.**

68. Freedom Economy brings this action on behalf of its members, which include certified CDFIs that have applied for FY25 CDFI Fund awards and continue to await decisions. Ensuring that its CDFI members can access congressionally appropriated funds is central to Freedom Economy's organizational mission.

69. Freedom Economy's CDFI members are long-standing participants in the CDFI Fund's programs. They are experienced, mission-driven lenders and intermediaries that have navigated the Fund's application and award processes over multiple funding cycles. Certain of Freedom Economy's CDFI members have received Financial Assistance awards in previous funding rounds, and Freedom Economy's members have collectively received tens of millions of dollars in cumulative awards across multiple program categories, including Base-FA, the Emergency Relief Program, and the Rapid Recovery Program, which they deployed to extend affordable credit to underserved communities.

70. These members of Freedom Economy submitted applications in the FY25 funding round and have received no decision. These CDFIs depend on CDFI Fund awards not only as a direct source of capital but also as a catalyst for raising the matching funds required by statute and for attracting additional private and philanthropic investment. The prolonged uncertainty created by Defendants' inaction has impaired their ability to commit capital to borrowers and maintain the staffing and operational capacity necessary to serve their communities. Borrowers in their lending pipelines—small business owners awaiting loan closings, affordable housing developers with projects stalled mid-construction, community facilities serving low-income neighborhoods—cannot wait indefinitely. If the FY25 funds expire without awards being made, Freedom Economy's CDFI members will permanently lose the capital they applied for, the matching funds they assembled will go unmatched, and the projects in their lending pipelines will go unfunded.

71. Defendants' obstruction does not merely injure Freedom Economy's members; it deprives the very communities Congress sought to reach. CDFIs serve communities that the conventional banking system has largely passed over—rural towns without a bank branch, urban neighborhoods scarred by decades of disinvestment, tribal lands, and immigrant communities. For small business owners in these communities, the practical alternative to a CDFI loan is not a bank loan; it is a predatory lender charging interest rates that may approach or exceed 100%, or no loan at all. Every day that Defendants delay is a day in which viable businesses go unfunded, entrepreneurs are driven to predatory lenders, and the communities Congress intended to support are denied the capital they need.

72. Freedom Economy does not identify its CDFI members by name in this Complaint because those members have expressed serious concern that visible participation in litigation against the agencies that control their certification and funding could subject them to retaliatory scrutiny, adverse treatment in pending or future award decisions, or other reprisals. Those members face concrete, imminent, and irreparable injury from Defendants' deliberate inaction: their FY25 applications remain pending, no decision has been disclosed to them, and Treasury has given no assurance that any award to them will be obligated before the funds expire. Freedom Economy seeks only declaratory and injunctive relief directed at Defendants' statutory obligations, and no individualized proof or participation by its members is necessary to adjudicate these claims.

73. Freedom Economy and its members have been denied "the opportunity to compete for a pool of funds for which they are able and willing to compete." *Global Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025). If the FY25 funds expire on September 30, 2026, Freedom Economy's members will permanently lose the opportunity to compete for those awards, and the communities they serve will never receive the capital Congress appropriated.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(1)—Agency Action Unlawfully Withheld or Unreasonably Delayed (FY25 Funds)

74. Plaintiff restates and incorporates by reference paragraphs 1 through 77 as though fully set forth herein.

75. A reviewing court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Section 706(1) provides a judicial remedy—in the nature of mandamus—where the defendant agency has refused to undertake a "discrete agency action that [the agency] is required to take." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis removed).

76. The Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, and the Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, impose a non-discretionary duty on Treasury to administer the CDFI Program by evaluating applications, announcing awards, executing Assistance Agreements, and obligating the appropriated funds before those funds expire on September 30, 2026. These are discrete, mandatory actions required by statute—not matters of executive discretion. Treasury has not disclosed that it has completed any of them with respect to the FY25 funding round.

77. Treasury has had the apportioned FY25 program funds and completed applications in hand since April 2026. Five months elapsed before Treasury issued a press release on September 15, 2026, purporting to announce awards—yet as of the date of this Complaint, Treasury has not disclosed that it has issued a Notice of Award or executed an Assistance Agreement for any of the $289 million Congress appropriated. An announcement is not an obligation. Moreover, OMB's Footnote A1, which requires Treasury to provide three days' advance notice to OMB before any

public announcement or obligation of award amounts, imposes an additional unauthorized hurdle that further delays Treasury's ability to act.

78. Treasury's refusal to act is both unlawful and unreasonable by any measure. Applications have been pending for more than seventeen months. The standard processing timeline is approximately eight months. The funds expire in nine days. Treasury's September 15, 2026 press release does not cure the delay: Treasury has disclosed no Notice of Award, no executed Assistance Agreement, no recipient and no amount, and it has not committed to obligating the full $289 million before the funds expire. The effect of continued inaction is not merely inconvenient—it creates an irreparable harm because if the appropriation lapsed permanently, the funds would never be recovered. No amount of future relief can restore an expired appropriation. Treasury's failure to obligate the FY25 funds constitutes agency action unlawfully withheld and unreasonably delayed in violation of 5 U.S.C. § 706(1).

**COUNT II**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)—Arbitrary and Capricious, and Contrary to Law (FY25 Funds)**

79. Plaintiff restates and incorporates by reference paragraphs 1 through 77 as though fully set forth herein.

80. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

81. Treasury's prolonged failure to act on completed FY25 applications—viewed against the backdrop of the Administration's repeated proposals to eliminate the CDFI Fund, the public characterization of CDFIs as "woke," the reduction-in-force notices issued to virtually all of the CDFI Fund staff, and the imposition of new anti-preference certification requirements—is

not only action unlawfully withheld or unreasonably delayed. It is the deliberate implementation of a policy decision Congress expressly rejected: the elimination of the CDFI Fund's award programs. Treasury's September 15, 2026, press release does not alter this conclusion. By allowing more than seventeen months to elapse without disclosing a single Notice of Award or executed Assistance Agreement—and leaving at most nine days before the funds expire—Treasury is implementing a policy of inaction to accomplish what it could not accomplish through the legislative process: a de facto denial of every pending application and a de facto rescission of the funds Congress appropriated.

82. Treasury's conduct is contrary to law. The Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, the Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, and the Riegle Act require Treasury to administer the CDFI Program and obligate the appropriated funds for the purposes Congress specified. The 2026 Appropriations Act specifically prohibits the use of any appropriated funds to "increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request" unless Congress enacts that change. Pub. L. No. 119-75, § 739, 140 Stat. at 502. Treasury's inaction amounts to the unilateral implementation of the President's rejected budgetary goal of eliminating the CDFI Fund's award programs.

83. Treasury's conduct is also arbitrary and capricious. Defendants have offered no reasoned explanation for the delay. They have considered factors Congress did not permit them to consider—namely, whether the CDFI Program aligns with the Administration's policy preferences, as reflected in a budget Congress rejected. They have failed to consider the serious reliance interests of CDFIs that submitted applications in reliance on the NOFA's stated timeline, or the detrimental impact on the communities those CDFIs serve. And they have failed to consider

reasonable alternatives to allowing the appropriation to lapse. For each of these independently sufficient reasons, Treasury's conduct violates 5 U.S.C. § 706(2).

**COUNT III**
**Violation of the Appropriations Clause, U.S. Const. Art. I, § 9, cl. 7, and Separation of Powers**

84. Plaintiff restates and incorporates by reference paragraphs 1 through 77 as though fully set forth herein.

85. The Appropriations Clause of the Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Clause vests the power of the purse exclusively in Congress and prohibits the Executive Branch from nullifying, suspending, or countermanding a congressional appropriation. The corollary principle, rooted in the constitutional separation of powers, is that the Executive may not decline to spend funds Congress has directed to be spent for a particular purpose.

86. Defendants' conduct violates the Appropriations Clause and the constitutional separation of powers. Congress appropriated $324 million for the CDFI Fund for each of fiscal year 2025, designating $289 million in each year for the Fund's award programs. Congress rejected the President's proposals to eliminate those programs. Congress enacted an express prohibition on the use of any appropriated funds to "increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request" unless Congress itself enacts that change. Pub. L. No. 119-75, § 739, 140 Stat. at 502. Despite these unambiguous directives, Defendants have refused to administer the CDFI Program, withheld and delayed apportionment of the appropriated funds, and imposed unauthorized conditions on their obligation—effectively nullifying the appropriations Congress enacted. By substituting the Executive's policy preferences for Congress's spending decisions, Defendants have usurped the legislative power of the purse in

violation of the Appropriations Clause and the structural separation of powers the Constitution commands.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Pursuant to 28 U.S.C. §§ 2201 and 2202: declare that Defendants have unlawfully withheld and unreasonably delayed acting on pending fiscal year 2025 CDFI Program applications as required by law; declare that Defendants' withholding of the fiscal year 2025 CDFI Fund program appropriations without transmitting a special message to Congress violates the Impoundment Control Act, 2 U.S.C. §§ 682-688; declare that Defendants' refusal to administer the CDFI Program and obligate the funds Congress appropriated violates the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, and the constitutional separation of powers; and declare that the fiscal year 2025 program funds shall be available for obligation and awarded to eligible applicants, including Freedom Economy's eligible members, in accordance with 12 U.S.C. § 4706 and 12 C.F.R. § 1805.701;

B. Pursuant to 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. § 706(2)(A): declare unlawful and vacate Footnote A1 on the SF-132 Apportionment Schedule for Treasury Account 020-1881; and declare unlawful and set aside Defendants' failure to evaluate, announce, and obligate awards under the fiscal year 2025 CDFI Program funding round as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C.

§ 706(2)(A), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

C. Pursuant to 5 U.S.C. § 706(1): issue permanent injunctive relief, ordering Defendants to cease withholding or unreasonably delaying action on the FY25 CDFI Program applications, and before the fiscal year 2025 funds expire on September 30, 2026, to evaluate the pending applications, announce awards, issue Notice of Award, and obligate the FY25 program funds consistent with statutory and regulatory requirements and without regard to any unauthorized conditions on obligation and thereafter to execute Assistance Agreements and disburse the obligated funds in the ordinary course;

D. Award Plaintiff its reasonable costs and attorneys' fees; and

E. Grant any other relief that the Court deems just and proper.

Dated: September 21, 2026

Respectfully submitted,

/s/ Daniel W. Wolff

GLOBAL BLACK ECONOMIC FORUM

Alphonso David (*pro hac vice* forthcoming)
34 35th Street, Suite 5A
Brooklyn, NY 11232
(212) 287-5864
alphonso.david@gbef.com

CROWELL & MORING LLP

Daniel W. Wolff (D.C. 486733)
Sharmistha Das (D.C. 1028821)
Qorah Thorner (D.C. 90046785)
Henry Leung (*pro hac vice* forthcoming)
600 Fifth Street NW
Washington, DC 20001
(202) 624-2621
dwolff@crowell.com

Derick D. Dailey (D.C. 1601705)
Cristina Diaz (*pro hac vice* forthcoming)
Two Manhattan West
375 Ninth Avenue

New York, NY
(212) 803-4016
ddailey@crowell.com

*Counsel for Plaintiff*